**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

ANNIE J. DANIEL                                    CIVIL ACTION

VERSUS                                             NO. 20-81-SDD-SDJ

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY
AND A&M COLLEGE

<u>**RULING**</u>

Pending before the Court is the *Motion for Summary Judgment*[1] filed by Defendant, the Board of Supervisors of Louisiana State University and Agricultural & Mechanical College ("LSU"). Plaintiff, Dr. Annie J. Daniel ("Plaintiff" or "Dr. Daniel"), filed an *Opposition*[2] to this motion, to which LSU filed a *Reply*.[3] LSU also filed a *Supplemental Motion for Summary Judgment*.[4] For the reasons that follow, LSU's *Motion* shall be granted.

**I.       STATEMENT OF UNDISPUTED MATERIAL FACTS**

Before setting forth the specific facts at issue in this case, the Court notes that Local Rule 56(f) provides:

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.

---

[1] Rec. Doc. No. 15.
[2] Rec. Doc. No. 22.
[3] Rec. Doc. No. 37.
[4] Rec. Doc. No. 20.

68650                                                                                    1

> The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

When LSU filed its *Statement of Material Facts Not at Issue*,[5] its assertions of fact were not accompanied by citations to the record. For that reason, Dr. Daniel argues that LSU's alleged undisputed facts should be stricken for failure to comply with the local rule.[6] LSU disagrees, explaining that "Plaintiff overlooks the fact that the precise set of facts are set forth fully in Defendant's *Memorandum in Support* with the record citations duly noted."[7] Considering that the citations to the record were available alongside the identical factual assertions made in the body of LSU's *Memorandum*, and that LSU filed an amended *Statement* that included record citations,[8] the Court declines to impose the harsh sanction of striking LSU's *Statement of Material Facts Not at Issue*.[9] Doing so would deem admitted the facts set forth in Dr. Daniel's *Statement of Material Facts Genuinely in Dispute*, a result that is not warranted by what amounts to a clerical error, since corrected. Accordingly, the Court will consider both parties' *Statements*.

## II.    FACTUAL BACKGROUND[10]

On January 1, 2014, Dr. Annie J. Daniel began working at the Louisiana State University School of Veterinary Medicine ("LSU SVM") as a Clinical Track Associate Professor of Veterinary Medical Education and as the Director of Veterinary Instructional

---

[5] Rec. Doc. No. 15-2.
[6] Rec. Doc. No. 22-1, p. 1.
[7] Rec. Doc. No. 38, p. 1.
[8] Rec. Doc. No. 38.
[9] Rec. Doc. No. 15-2.
[10] While the Court reviewed all of the briefs and exhibits, as well as Plaintiff's *Statement of Material Facts Genuinely in Dispute* and LSU's *Statement of Material Facts Not at Issue*, this factual presentation focuses primarily on those facts material to the Court's *Ruling*.

68650                                                                                          2

Design and Outcome Assessments.[11] Though the position was a new one at LSU SVM, Dr. Daniel was not new to the field, having previously been employed in similar capacities at Des Moines University and at the Tulane University School of Medicine.[12] Among Dr. Daniel's responsibilities at LSU SVM was "curriculum mapping," which she describes as using "an electronic database to document all of the elements of the curriculum" in order to ensure that "each course, each lecture, has been aligned with . . . the learning objectives, the assessment method, method of teaching, as well as the institutional accreditation standards."[13] Dr. Daniel, a black woman, has a Ph.D in Education,[14] but no background in veterinary science.

When she started at LSU SVM, Dr. Daniel's supervisor was Dr. Joseph Taboada, a white man who was at that time the Associate Dean for Student and Academic Affairs.[15] During the interview process, Dr. Daniel had spoken with Dr. Taboada on the phone, and he asked her about her skills and job experience.[16] Shortly after Dr. Daniel was hired, Dr. Taboada visited her at her office. Dr. Daniel alleges that "out of the blue," Dr. Taboada said, "You know, I didn't know you were black because you didn't sound black on the phone."[17] Dr. Daniel reports that she "just kind of ignored"[18] the comment. Dr. Taboada denies making the comment, asserting that "that never happened."[19]

---

[11] Rec. Doc. No. 22-5, p. 149 (Exhibit 1 to Deposition of Dr. Annie Daniel).
[12] Rec. Doc. No. 22-5 (Deposition of Dr. Annie Daniel), p. 2, lines 16-18; *Id*. at p. 8, lines 12-14.
[13] *Id*. at p. 10, lines 13-19.
[14] *Id*. at p. 12, line 5.
[15] Rec. Doc. No. 15-2, ¶ 3 and 5; Rec. Doc. No. 22-1, ¶ 1.
[16] Rec. Doc. No. 22-5, p. 3, lines 18-20.
[17] *Id*. at p. 17, lines 17-19.
[18] *Id*. at line 21.
[19] Rec. Doc. No. 20-3 (Deposition of Dr. Joseph Taboada), p. 16, lines 11-16.

68650                                                                                           3

Dr. Daniel and Dr. Taboada occasionally discussed diversity at LSU SVM. Dr. Taboada testified that he "talked a lot about black students" with Dr. Daniel, specifically about "one of the problems that we have within the profession and within the school is that we're not a very diverse profession. So this is a big issue, is to try and increase diversity within the profession."[20] Dr. Daniel agrees that she on several occasions "tried to give [Dr. Taboada] recommendations on how to improve diversity, how to recruit, and things like that."[21] Dr. Daniel alleges that, in one such conversation that took place within a few months of her hiring, Dr. Taboada made a number of racist statements about black students and the reasons for the lack of black students at LSU SVM. When she asked Dr. Taboada why there were so few, he allegedly stated that "they," meaning black students, "don't do well,"[22] and told the story of a black student at LSU SVM who took seven years to complete the program, which normally takes four years.[23]

On another occasion, in Dr. Daniel's office in summer 2014, Dr. Daniel alleges that Dr. Taboada said "Black people don't expect their kids to go to college. . .[b]ecause they don't go to college themselves."[24] At some point, Dr. Taboada allegedly stated that Southern University, a historically black college, is "academically weak" and that the students who come to LSU SVM from there "do not do well."[25] In the context of discussing Dr. Daniel's planned recruiting trips to historically black colleges, Dr. Taboada allegedly told her that, on a previous recruiting trip, he was told that "[b]lacks preferred for their

---

[20] *Id*. at p. 16-17.
[21] Rec. Doc. No. 22-5, p. 31, lines 5-8.
[22] *Id*. at p. 21, lines 8-9.
[23] *Id*. at p. 22, lines 12-24.
[24] *Id*. at p. 21, lines 10-15.
[25] *Id*. at p. 32 lines 13-20.

68650

students to go to med school, not vet school."[26] Similarly, he once allegedly cited his belief

that "African-American applicants would be burdened with student loans"[27] as a factor in

the low number of black students at LSU SVM. Dr. Daniel testified that she found all of

the above remarks to be racially offensive.[28] She maintained a list of Dr. Taboada's

remarks as she recalled them:[29]

Reasons Why LSU SVM Do Not Have More Black Students:

1. We do not want to burden them down with student loans
2. Poor Blacks do not expect their kids to go to college
3. Black people without college degrees have no expectation for their children to go to college
4. They are just not applying to our school
5. Southern University students are not academically strong enough
6. Southern University has a weak animal science program, and their students are not successful here
7. If they go to Tuskegee, they don't pay out of state tuition
8. They do not have any pre-vet school veterinary medicine experiences
9. I was told by reps at Grambling University that they send their students to med school not vet school
10. Black students just cannot keep up with the pace and content, they just do not do well here.
11. We want to enroll the best students
12. We want the best students here
13. Interns from Tuskegee don't know as much as our students,
14. An intern from Tuskegee's knowledge about veterinary medicine is limited and they lack clinical experience

---

[26] *Id.* at p. 40, lines 20-25.
[27] *Id.* at p. 45, lines 23-25.
[28] *Id.* at p. 48, lines 1-5.
[29] *Id.* at p. 173 (Exhibit 13 to Deposition of Dr. Daniel).
68650

For his part, Dr. Taboada denies making any of the remarks alleged by Dr. Daniel[30] but acknowledges that "there's little nuggets of things in here"[31] that they did discuss. For example, he testified that his predecessor, Dr. John Rhodes, told him that "Southern was one of the schools . . . that students tended to struggle from," and that he repeated that remark to Dr. Daniel.[32] Dr. Taboada asserts that he did not know Dr. Daniel was upset by his comments and that "nobody ever told [him] anything about"[33] her allegation that he was racist. Dr. Lorrie Gaschen, the chair of the LSU SVM Diversity Committee, testified that she knew "Taboada and Daniel had difficulties working and interacting together."[34] At some point in 2016 or 2017, Dr. Gaschen stated, Dr. Daniel came to her with an iPad where she had "a long list of things that Dr. Taboada had said,"[35] and went with Dr. Daniel to present the list to the Dean. When asked whether she had heard Dr. Taboada make the comments about black students on the list, Dr. Gaschen confirmed that she had.[36] She also stated that, in her view, the comments were "racist."[37]

In her original state court *Petition*, Dr. Daniel accused LSU of "removing her job duties and changing her job function, isolating/alienating her, falsely accusing her of policy/procedure violations and poor work performance . . . preventing her from attending trainings. . .moving her office to an undesirable location near the animal pasture, unilaterally transferring her to an undesirable reassignment, issuing her negative performance evaluations which affected her pay, and engineering through pretense and

---

[30] Rec. Doc. No. 20-3, p. 19; p. 28-31; p. 58 ("[D]id I say those things? No").
[31] *Id*. at p. 58, line 16.
[32] *Id*. at p. 19-20.
[33] *Id*. at p. 21, lines 11-15.
[34] Rec. Doc. No. 22-6 (Deposition of Dr. Lorrie Gaschen), p. 2, lines 24-25.
[35] *Id*. at p. 5, lines 1-5.
[36] *Id*. p. 10 *et seq*.
[37] *Id*. at p. 39, lines 2-5.

68650                                                                                                      6

false statements to the faculty appointment committee in a vote of non-reappointment. . .."[38] In her *Opposition* to the *Motion for Summary Judgment*, Dr. Daniel elaborates on the situations that she contends constituted adverse employment actions against her. For example, she alleges that when she presented Dr. Taboada with the idea of creating a competency-based curriculum, "it was ignored" and that Dr. Heidi Banse, a white woman, is now doing "exactly what [she] proposed."[39] Dr. Daniel also complains that when Dr. Taboada sent a group of faculty to a clinical skills workshop, she alleges that she "wasn't included in that group."[40] Dr. Daniel testified that she "told the dean constantly" that she should be included and that Dean Joel Baines said he would talk to Dr. Taboada about it.[41] Further, Dr. Daniel alleges that after three years at LSU SVM, she had yet to receive a performance evaluation. When she asked Dr. Taboada about it, she alleges that he referred her to Dr. Paccamonti, who was the chair of Veterinary Clinical Services, the "academic home" to which Dr. Daniel was assigned.[42] Dr. Paccamonti demurred, believing that he should not evaluate her because Dr. Daniel's work was "in student affairs."[43] Dr. Daniel was eventually evaluated by Dean Baines in May 2018 and June 2019.[44]

Dr. Daniel was assigned a graduate assistant to work with her.[45] She inquired about the possibility of moving to a larger office, not only to have space for her student

---

[38] Rec. Doc. No. 1-2, p. 3.
[39] Rec. Doc. No. 22-5, p. 79, lines 4-11.
[40] *Id*. at lines 16-19.
[41] *Id*. at p. 80, lines 8-20.
[42] *Id*. at p. 81-82.
[43] *Id*. at p. 81, lines 22-25.
[44] Rec. Doc. No. 20-2, p. 102-5.
[45] Rec. Doc. No. 22-5, p. 85, lines 13-14.
68650                                                                              7

worker,[46] but also to escape the loud conversations and dogs barking outside of her current office.[47] LSU moved Dr. Daniel to a new office in a laboratory building at the SVM complex where other LSU SVM faculty also have offices.[48] Dr. Daniel asserts that "they put [her] in the smallest one they could find"[49] despite larger ones being available.

Dr. Daniel also cites a May 18, 2017 meeting of the Courses and Curriculum Committee as evidence of LSU's adverse actions against her. In that meeting, the committee chair requested that faculty members copy and paste their lecture schedules into a document and send them to her so that the committee could tabulate how many hours the faculty spent lecturing.[50] Dr. Daniel alleges that, while the chair was explaining this, Dr. Taboada "stopped her and turned to [Dr. Daniel] and he said, 'That looks like something Annie can do.'"[51] To Dr. Daniel, this was offensive because "it seemed like he thought it was beneath something that a faculty could do, but Annie could do it."[52] Dr. Daniel concedes that Dr. Taboada "didn't say it in so many words," but in her view, he meant that copy and pasting was "something. . .the only black woman in the room should be doing and not any of the white people."[53] Dr. Daniel responded "I am not going to do that,"[54] to which Dr. Taboada replied, "If you are not going to do that, then you are not doing what we hired you to do."[55]

---

[46] *Id*., lines 16-23.
[47] *Id*. at p. 87, lines 1-12.
[48] *Id*. at p. 87-88.
[49] *Id*. at p. 88, lines 9-10.
[50] *Id*. at p. 89-90.
[51] *Id*. at p. 90, lines 10-12.
[52] *Id*. at p. 91, lines 2-5.
[53] *Id*., lines 18-20.
[54] Rec. Doc. No. 22-5, p. 171 (Exhibit 12 from Deposition of Dr. Daniel).
[55] *Id*.

Dr. Daniel also asserts that her duties were "given to [a] white faculty member, Dr. Heidi Banse,"[56] and that Dr. Banse's position was "specifically created to subsume Dr. Daniel's job"[57] because Dr. Taboada "didn't want to have to deal with a black woman."[58] Dr. Taboada denies having any involvement in Dr. Banse's hiring.[59] Per Dr. Taboada, Dr. Banse was hired "in the department of veterinary clinical science as an equine internist."[60] Although Dr. Taboada stated that Dr. Banse "is performing duties that I would have hoped that Dr. Daniel would have been able to grow her position into. I don't believe she's performing any duties that – that Dr. Daniel was *actually* performing."[61]

In particular, Dr. Daniel objects to Dr. Banse's involvement with the creation of a "Teaching Academy" at LSU SVM, which Dr. Daniel asserts was her idea and was assigned to her until she was "removed from working"[62] on it. At one point in her deposition, Dr. Daniel attests that she was "in the process of working to develop" the Academy when "Dr. Taboada and Heidi Banse went ahead."[63] Yet, when asked if she had taken any steps to develop the Teaching Academy before Dr. Banse began working on it, Dr. Daniel testified, "I did not take any steps to develop this . . . I had not taken any steps."[64] The record reflects that Dr. Banse included Dr. Daniel on an email announcing the inaugural meeting of the Teaching Academy,[65] seeking to "identify a core group of

---

[56] Rec. Doc. No. 22, p. 9.
[57] *Id*.
[58] Rec. Doc. No. 22-5, p. 84.
[59] Rec. Doc. No. 20-3, p. 37, lines 22-24.
[60] *Id*., lines 20-22.
[61] *Id*. at p. 38, lines 14-18 (emphasis added).
[62] Rec. Doc. No. 22, p. 10.
[63] Rec. Doc. No. 22-5, p. 102, lines 8-10.
[64] Rec. Doc. No. 22-5, p. 106, lines 2-9.
[65] Rec. Doc. No. 15-3, p. 47.

68650                                                                                              9

teaching-focused faculty to lead this group."[66] Dr. Taboada recalled that he "asked Dr. Banse to consult with Dr. Daniel in the process" because she had experience with teaching academies, and that "Dr. Banse said she did talk to Dr. Daniel about that and that she expressed she wasn't interested in working with Heidi to do that."[67] Dean Baines confirmed that he had assigned the creation of a Teaching Academy to Dr. Daniel[68] and that, when Dr. Banse initiated one, he "asked Dr. Daniel to work with them. . .to get the academy implemented to the best that it could be."[69] That did not happen, he testified, because "Dr. Daniel stepped away" and was "nowhere to be seen"[70] at the meetings.

Asked whether Dr. Banse took over some of Dr. Daniel's job duties, Dean Baines testified "[n]o, I don't view it that way."[71] Although they both have duties related to curriculum, Baines explains that "Dr. Banse is a content expert, whereas Dr. Daniel is a pedagogical expert. So Dr. Banse is advising on arranging the content in the curriculum to get it appropriate for training of a first-year veterinary student," which is outside of Dr. Daniel's expertise in his view because she is "not a veterinarian."[72] For her part, Dr. Banse testified that she "did not know"[73] that Dr. Daniel had already proposed a Teaching Academy at SVM until Dr. Daniel told her. It was Dr. Banse's understanding that Dr. Daniel's role was "outcomes assessment, and she oversaw the creation of our curriculum map."[74] The "area of overlap"[75] that Dr. Banse perceives between her role and Dr.

---

[66] *Id.*
[67] Rec. doc. No. 20-3, p. 52, lines 17-25.
[68] Rec. Doc. No. 20-2, p. 23, lines 11-14.
[69] *Id.* at p. 27, lines 3-8.
[70] *Id.*
[71] *Id.* at p. 34, lines 16-18.
[72] Rec. Doc. No. 20-2, p. 34-35.
[73] Rec. Doc. No. 20-7, p. 3, line 25.
[74] *Id.* at p. 20, lines 2-4.
[75] *Id.* at p. 26, line 20.

Daniel's role is with respect to curriculum, but "there can be different roles within" that project and she sees herself as a "content expert."[76]

In May 2017, Dr. Daniel met with Gaston Reinoso, an LSU Human Resources official who recalls their conversation as centering around her being "frustrated with the management at the vet med college, was frustrated with the lack of direction . . . the lack of attention of the dean on how the relationship between her and Joseph Taboada was at the time, and her biggest concern was the lack of direction and some comments that he had made about African-American students not attending college."[77] Reinoso later asked Dr. Taboada if he made the alleged comments about black students, and Taboada told Reinoso "that he didn't say that."[78] Reinoso told Dr. Taboada that "if there was [sic] any of those comments. . .that needed to stop immediately."[79]

Dr. Daniel met with Provost Dr. Jane Cassidy in February 2018 to detail her concerns about the alleged harassment and discrimination.[80] On June 4, 2018, Dr. Daniel emailed Gaston Reinoso in Human Resources regarding the Teaching Academy.[81] On February 19, 2019, Dr. Daniel had her "normal weekly meeting"[82] with Dean Baines, which they implemented when he began supervising her instead of Dr. Taboada.[83] By that point, Dr. Daniel attests, Dr. Taboada "totally avoided [her] and did not include

---

[76] *Id*. at p. 37, line 10.
[77] Rec. Doc. No. 20-9, p. 5, lines 5-13.
[78] *Id*. at p. 10, line 2.
[79] *Id*. at p. 19, lines 18-20.
[80] Rec. Doc. No. 22-5, p. 145 *et seq.*
[81] Rec. Doc. No. 20-9, p. 45.
[82] Rec. Doc. No. 22-5, p. 109.
[83] The parties agree that Dr. Taboada was reassigned and no longer served as Associate Dean after 2017. They further agree that Dr. Taboada's reassignment was not related to Dr. Daniel's accusations. Rec. Doc. No. 22-1, p. 11 (Although Dr. Taboada was supposedly removed from his position as Associate Dean in 2017, that was unrelated to Dr. Daniel's complaints of racism"); Rec. Doc. No. 15-2, p. 4 ("Dr. Taboada's reassignment was not related to the plaintiffs complaints").

68650                                                                                                    11

[her]."[84] She testifies that she "explained to the dean the stress and anxiety that [she] was suffering from having to work with somebody that had such strong racist feelings about black people."[85] Dr. Daniel asked Dean Baines about the possibility of being transferred out of SVM to a different department.[86]

Dean Baines completed an evaluation of Dr. Daniel in June 2019 that she contends is discriminatory because it "describes [her] as inflexible when [she's] not inflexible."[87] To Daniel, "the way that they describe me as a black woman is almost like, you know, I'm this angry black woman,"[88] though she acknowledges that those words do not appear in the evaluation. Dr. Daniel also objects to the statement in the evaluation that she has "perceived contempt of the curriculum committee,"[89] which she finds to be unfounded.

In 2018, Dean Baines and the faculty undertook a vote on Dr. Daniel's reappointment, and the faculty voted 7 to 1 to recommend against reappointment.[90] Dean Baines attributed that outcome to his perception that Dr. Daniel had "limited contact and interactions with faculty" and that "[m]any do not understand her role as a result."[91] Dr. Daniel was nevertheless reappointed. On April 12, 2019, Dr. Daniel filed Charges of Discrimination with the Equal Opportunity Employment Commission ("EEOC").[92] Dean Baines' June 2019 performance evaluation of Dr. Daniel was overall "satisfactory."[93] The

---

[84] *Id*. at p. 112, lines 13-14.
[85] *Id*. at p. 110, lines 11-14.
[86] *Id*. at lines 18-23.
[87] *Id*. at p. 129, lines 18-19.
[88] *Id*. at lines 22-25.
[89] *Id*. at p. 130 lines 8-14.
[90] Rec. Doc. No. 22-5, p. 130, lines 19-25; Rec. Doc. No. 20-2, p. 105.
[91] Rec. Doc. No. 20-2, p. 105.
[92] Rec. Doc. No. 22-10 (Exhibit I).
[93] Rec. Doc. No. 20-2, p. 106.

68650

following year, he rated her as "needs improvement."[94] Dr. Daniel contends that the downturn in Baines' evaluation of her performance is "retaliation."[95]

Overall, LSU concedes that, at the summary judgment stage, "Dr. Daniel's contention that [Dr. Taboada's] statements were made must be taken as true."[96] Nevertheless, LSU maintains, "it is significant that Dr. Taboada denies many of the statements and as to others describes very different versions of what was actually said."[97] LSU contends that it is entitled to summary judgment because, even assuming that Dr. Taboada made the statements in question, Dr. Daniel's claims fail because the comments are mere "stray remarks" that are not actionable, and not, as Dr. Daniel contends, "direct evidence" of discrimination. Further, LSU argues that Dr. Daniel fails to establish that LSU took an adverse employment action against her, a failure that is fatal to her Title VII discrimination and retaliation claims and her Louisiana Employment Discrimination Law claim. Additionally, LSU contends that much of the conduct described by Dr. Daniel is not properly before the Court because it is time-barred under the law. After reviewing the record evidence and the relevant law, the Court agrees with LSU and finds that summary judgment shall be granted on all of Dr. Daniel's claims, for the reasons discussed below.

## III.    LAW AND ANALYSIS

### A. Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment

---

[94] Rec. Doc. No. 22-5, p. 182.
[95] Rec. Doc. No. 22, p. 11.
[96] Rec. Doc. No. 15-1, p. 3.
[97] *Id*.

as a matter of law.[98] This determination is made "in the light most favorable to the opposing party."[99] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[100] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[101] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[102]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[103] All reasonable factual inferences are drawn in favor of the nonmoving party.[104] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[105] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to

---

[98] FED. R. CIV. P. 56(a).
[99] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[100] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[101] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[102] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).
[103] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[104] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[105] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

68650                                                                                              14

support the complaint."'"[106]

## B. Prescription

### 1. Title VII Discrimination

LSU argues that Dr. Daniel's Title VII discrimination claims based on actions occurring more than 300 days prior to her filing of an EEOC Charge on May 30, 2019 are time barred.[107] Thus, LSU contends, Dr. Daniel cannot carry her burden of proving her discrimination claim using "remarks by Dr. Taboada occurring at the latest in 2016."[108] Dr. Daniel rejects this argument, stating, "[t]his is not the law."[109] Citing *National R. R. Passenger Corp. v. Morgan*, Dr. Daniel argues that "as long as one incident forming the basis for Dr. Daniel's claims for race-based harassment and retaliatory harassment occurred within 300 days from the filing of her EEOC Charge. . .the entirety of her claims are timely."[110] Dr. Daniel's argument is, in fact, not the law when it comes to Title VII discrimination claims. In *Morgan*, the United States Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period"[111] of 300 days. However, the *Morgan* Court instructs that behavior occurring outside of the statutory time period may be considered in the context of a *hostile work environment claim*, as long as "an act contributing to that hostile environment takes place within the statutory time period."[112] Thus, Dr. Daniel's contention that older incidents may be considered is correct with respect to her harassment claim. However, as to her

---

[106] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex*., 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[107] Rec. Doc. No. 15-1, p. 10.
[108] *Id*.
[109] Rec. Doc. No. 22, p. 13.
[110] *Id*.
[111] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).
[112] *Id*.

68650

Title VII discrimination claim, the law is clear that "[i]n Louisiana, a plaintiff has 300 days from the date of the alleged discriminatory conduct to file a charge of discrimination with the EEOC. Any claims not described in the EEOC charge are not properly before the Court."[113] Accordingly, Dr. Daniel's Title VII discrimination claims based on events that occurred 300 days before May 30, 2019, or before August 3, 2018, are time-barred.

       2.  <u>Title VI Claims</u>

LSU also argues that Dr. Daniel's claims arising under Title VI are prescribed, noting that such claims "are subject to state statutes of limitations for personal injury actions."[114] In Louisiana, that period is one year.[115] Therefore, LSU contends, because Dr. Daniel filed suit in January 2020, any of her claims based on conduct occurring prior to January 2019 are time barred, including "Dr. Taboada's alleged statements, the office re-assignment and the failure to provide support."[116] Dr. Daniel does not disagree with LSU's statement of the relevant law, but avers that "her claims is [sic] not prescribed as she engaged in protected activity in February, March, and April 2019, she suffered tangible employment action."[117] This vague and conclusory statement is insufficient to defeat summary judgment. The Court finds that any pre-January 2019 conduct is time-barred and cannot provide a basis for Dr. Daniel's Title VI claims.

---

[113] *Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.,* 55 F. Supp. 3d 864, 874 (M.D. La. 2014), *aff'd sub nom. Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.,* 620 F. App'x 215 (5th Cir. 2015).
[114] *Sewell v. Monroe City School Board*, 974 F.3d 577, 583 (5th Cir. 2020).
[115] Louisiana Civil Code Article 3492.
[116] Rec. Doc. No. 15-1, p. 16.
[117] Rec. Doc. No. 22, p. 24.
68650

3. <u>State Law Claims</u>

A cause of action based on race discrimination is a delictual action subject to the one-year prescriptive period found in Louisiana Civil Code art. 3492. The prescriptive period commences to run the day the injury or damage is sustained – that is, upon the employee's first notice of an adverse employment action.[118] Prescription runs against all persons unless they are included in some exception established by law. LSA-C.C. art.3467. The same period applies to La. R.S.23:967 claims. Therefore, the plaintiff's state law claims arising more than one year prior to the filing of this lawsuit are time barred.

4. <u>Title VII and LEDL Claims for Race Discrimination</u>

Dr. Daniel asserts that LSU discriminated against her due to her race in violation of Title VII and the Louisiana Employment Discrimination Law ("LEDL").[119] Both Title VII and LEDL prohibit employers from discriminating based on race.[120] Because Title VII and LEDL share the same scope, claims under LEDL are analyzed under the Title VII framework and jurisprudential precedent.[121] Above, this Court concluded that Dr. Daniel's Title VII discrimination claims based on events that occurred 300 days before May 30, 2019, or before August 3, 2018, are time-barred. Because the timing of some of the alleged events is not clear and in the interest of completeness, the Court will nevertheless examine all of Dr. Daniel's claims, even where they are arguably prescribed.

---

[118] *Eastin v. Entergy Corp.,* 2003-1030 (La. 2/6/04), 865 So. 2d 49, 54.
[119] Louisiana Revised Statute §23:301 *et seq.*
[120] 42 U.S.C. § 2000e-2(a)(a); La. R. S. § 23:332.
[121] *See DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007).

68650

a. *Direct Evidence or Stray Remarks?*

A preliminary issue in this case is whether the evidence presented by Dr. Daniel is, as she contends, direct evidence of discrimination. LSU disputes this characterization, finding that the allegedly discriminatory comments were merely stray remarks, insufficient to demonstrate the requisite animus. Generally, a Title VII plaintiff may make out a *prima facie* case of discrimination using either direct or circumstantial evidence.[122] If the plaintiff presents only circumstantial evidence, then she must prove discrimination inferentially using "[t]he three-step *McDonnell Douglas-Burdine* 'minuet.'"[123] If, however, the plaintiff presents direct evidence of discrimination, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor."[124]

To determine whether comments in the workplace constitute "direct evidence" or only "stray remarks," courts look to four factors: whether the comments are (1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision.[125] In applying this test, the court's focus is on whether the comments prove, "without inference or presumption, that race was *a* basis in employment decisions" in the plaintiff's workplace.[126]

---

[122] *See Portis v. First Nat'l Bank,* 34 F.3d 325, 328 (5th Cir.1994).
[123] *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.,* 778 F.3d 473, 475 (5th Cir. 2015)(quoting *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994)).
[124] *Brown v. E. Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993).
[125] *Etienne v. Spanish Lake*, 778 F. 3d at 476 (citing *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 222 (5th Cir.2001)).
[126] *Id.* (citing *Jones v. Robinson Prop. Group, L.P.,* 427 F.3d 987, 993 (5th Cir.2005)).
68650

Dr. Daniel argues that the comments made by Dr. Taboada and others are direct evidence of racial discrimination. Although she cites the above-discussed standard for direct evidence, Dr. Daniel does not engage meaningfully with the standard, offering instead her own characterizations of Dr. Taboada's alleged statements. For example, Dr. Daniel argues that this is a direct evidence case because "LSU made it clear to Dr. Daniel that black applicants, students, and employees were less than equal to white at LSU SVM,"[127] and that multiple comments "expressed the animus that Dr. Daniel was not competent enough to do her job because she was black."[128] This approach to establishing direct evidence has several shortcomings. First, the arguments of counsel in briefs are unequivocally not *evidence* and cannot prevent summary judgment.  Second, where Dr. Daniel does cite to actual remarks in evidence, it is apparent to the Court that none of those remarks constitute direct evidence, and Dr. Daniel does not offer argument to the contrary, again choosing instead to paraphrase the remarks in a more inflammatory form, as if that establishes their "directness." Lastly, Dr. Daniel does not demonstrate that the remarks were related, either substantively or temporally, to the challenged employment decisions in this case (in fact, she fails to demonstrate that there were any adverse employment decisions at all; see *infra*).

Only one of the remarks cited by Dr. Daniel as direct evidence of discrimination was directed at her – the alleged comment by Dr. Taboada that Dr. Daniel did not sound black on the phone.  Dr. Taboada denies making this comment. At the summary judgment stage, the Court construes factual disputes "in the light most favorable to the opposing

---

[127] Rec. Doc. No. 22, p. 15.
[128] *Id*. at p. 16.
68650

party"[129] and will, therefore, as LSU concedes is appropriate, take as true Dr. Daniel's contention that the statement was made. The "didn't sound black on the phone" statement fails the direct evidence test because it would require an inference or presumption to conclude that the remark demonstrates that race was a basis for LSU's alleged adverse employment actions. In and of itself, Dr. Taboada's statement did not express discriminatory animus or indicate that Dr. Daniel's race was a factor in LSU's decision to hire her.  In other words, for Dr. Taboada's alleged remark to be evidence of discrimination, one must presume that he was *disappointed* to find that Dr. Daniel was black because LSU wanted to hire a white person. That meaning is not apparent on the face of his remark. Because a presumption is required to arrive at that conclusion, Taboada's remark is not direct evidence. Although Dr. Daniel offers the conjecture that Taboada's remark was direct evidence that he had a "preference for whites,"[130] that conclusion is not supported by the law.

Even assuming *arguendo* that Dr. Taboada's comment was discriminatory on its face, it cannot be called direct evidence, because Dr. Daniel does not demonstrate that the "black on the phone" remark was related to or close in time to any of LSU's employment decisions, beyond her own conclusory insistence that it was. The mere fact that the statement was allegedly made *in the office* does not suffice to connect it to LSU's alleged discriminatory decision-making. Nor does Dr. Daniel establish that Dr. Taboada was a person with authority over the employment decision that she challenges.[131]

---

[129] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).

[130] Rec. Doc. No. 22, p. 2.

[131] As discussed further *infra*, Dr. Daniel does not make a successful showing that she suffered adverse employment action under the law. To the extent that she argues that her alleged demotion, reassignment,

Other courts have likewise rejected plaintiffs' assertions that comments about their voice or manner of speaking, without a temporal or substantive nexus to the challenged employment action, were direct evidence of discrimination. In *Yul Chu v. Mississippi State University*, for example, the Fifth Circuit concluded that the plaintiff's testimony that "members of his department mocked his accent at different times"[132] was not direct evidence of discrimination because the jokes were not related to the challenged tenure decision. Similarly, the United States Court of Appeals for the Eleventh Circuit held in *Gonzales v. Fla. Dep't of Mgmt. Servs.* that a maintenance supervisor of Cuban descent did not have direct evidence of discrimination based on a manager's statement that the plaintiff should not have been hired because he "spoke with a heavy Cuban accent" and "spoke too loud."[133] Because these remarks were not related to the plaintiff's termination, substantively or temporally, the court concluded that they were not direct evidence of discrimination. The holdings in *Yul Chu* and *Gonzales* apply *a fortiori* to the instant case insofar as Dr. Taboada's comment about Dr. Daniel's voice was not critical or mocking; it was an apparently neutral statement. There is no record evidence to support Dr. Daniel's contention that his remark is proof that Dr. Taboada and LSU used race as a basis for employment decisions.

Furthermore, it is clear that Dr. Taboada's comment about Dr. Daniel sounding "black on the phone" falls well short of the type of statement that the Fifth Circuit has called direct evidence of racial discrimination and instead falls squarely within the

moving of offices, and lack of support were adverse actions, she does not demonstrate for purposes of the direct evidence issue that Dr. Taboada was the authority figure behind those actions.
[132] *Yul Chu v. Mississippi State Univ.,* 592 F. App'x 260, 264 (5th Cir. 2014).
[133] *Gonzalez v. Fla. Dep't of Mgmt. Servs.,* 683 F. App'x 738, 739 (11th Cir. 2017).
68650                                                                                                    21

category of "stray remarks." In *Patel v. Midland Memorial Hospital & Medical Center*,[134] the Fifth Circuit held that, under the "stray remarks" doctrine, a workplace slur does not provide sufficient evidence of discrimination unless it is related to the plaintiff's protected class, proximate in time to the adverse employment decision, made by an individual with authority over the plaintiff, and related to the employment decision at issue.[135]  The record evidence before the Court demonstrates that Dr. Daniel cannot rebut the stray remarks doctrine.  There is no evidence that any alleged comments were made proximate in time to the alleged adverse employment action and no evidence whatsoever that the alleged remarks were related to the decision to allegedly demote and reassign Dr. Daniel.

In *Eaglin v. Texas Childrens' Hospital*, the Fifth Circuit considered whether comments made to the plaintiffs, who worked at the cardiology reception desk, were direct evidence of racial discrimination. Those comments took the following form:

> [A supervisor] once "flipped" [the plaintiff's] hair and asked her how much she paid for it. [A different supervisor] also asked if [the plaintiffs] ate watermelon and fried chicken on holidays. [A supervisor] once told [the plaintiff] that she needed to "[e]ither ... change [her] hair [color] or ... go home for the rest of the day." [One supervisor] referred to [the plaintiffs] as "the black girls" and questioned the style and color of [their] hair, asking [plaintiff] whether she thought "it was professional to wear braids in the medical field."[136]

The *Eaglin* plaintiffs were also told that they "couldn't communicate with the patients" and that management "want to replace you-all with Hispanics."[137] The Fifth Circuit held that these comments were stray remarks because "the statements—even if offensive—were either not made by someone with authority to terminate Eaglin's employment, were not

---

[134] 298 F.3d 333 (5th Cir. 2002), *cert. denied*, 537 U.S. 1108 (2003).
[135] *Id*. at 344.
[136] *Eaglin v. Texas Children's Hosp.*, 801 F. App'x 250, 252 (5th Cir. 2020).
[137] *Id*.

proximate in time to her firing, or were not related to the termination decision. None of the statements, even 'if believed, proves the fact [of intentional discrimination] without inference or presumption.'"[138] The same can be said here of Dr. Taboada's "black on the phone" comment, which was a stray remark that, standing alone, is insufficient to survive summary judgment.

Dr. Daniel's attempt to prove that this a direct evidence case fares no better where she discusses the various comments allegedly made by Dr. Taboada regarding black students at LSU SVM. It appears to be Dr. Daniel's contention that these remarks are related to LSU's employment decisions insofar as Dr. Taboada's allegedly low opinion of black people, generally, must have bled over into LSU's employment relationship with Dr. Daniel. However, the evidence in the record clearly demonstrates that Dr. Taboada's remarks about black students were made not in the context of discussing Dr. Daniel's performance or employment but rather, in the context of what LSU describes as "their mutual interest in recruiting more minority students to the SVM."[139] Indeed, Dr. Daniel testified that "there's been several occasions where Dr. Taboada and I would – you know, I just tried to give him recommendations on how to improve diversity, how to recruit, and things like that."[140]

Clearly, to conclude that the remarks were related to Dr. Daniel's employment requires an inference that comments Dr. Taboada made in the context of discussing the pipeline of black students into veterinary medicine were, in his view, equally applicable to Dr. Daniel. That is, one must infer that because he allegedly had a low opinion of the

---

[138] *Id.* at 256.
[139] Rec. Doc. No. 15-1, p. 3.
[140] Rec. Doc. No. 22-5, p. 31, lines 5-8.

68650                                                                                    23

performance of black students, he also had a low opinion of Dr. Daniel's performance. On their face, however, these comments did not relate to Dr. Daniel except insofar as, like the black students being discussed, Dr. Daniel is black. In fact, Dr. Daniel herself testified that Dr. Taboada "didn't know that what he was saying applied to me."[141] Because it would require a presumption to conclude that Dr. Taboada's remarks about the capabilities of black students prove that he impermissibly used race a basis for employment decisions, the Court concludes that the evidence of discrimination cited by Dr. Daniel is circumstantial, not direct. In any event, as with the "black on the phone" remark, Dr. Daniel fails to bring forth record evidence establishing that Dr. Taboada's comments were proximate in time or substance to the challenged employment decisions, or in fact that they were related at all.

Dr. Daniel contends that her evidence "is similar to"[142] evidence that the Fifth Circuit concluded was direct in *Jones v. Robinson Prop. Group*.[143] In *Jones*, a black casino employee alleged that he was not hired as a poker dealer due to race discrimination, citing as evidence the white poker room manager's statements that "these good old white boys don't want black people touching their cards" and that "'maybe I've been told not to hire too many blacks in the poker room.'"[144] While the district court called these remarks circumstantial evidence, the Fifth Circuit reversed, holding that the statements in evidence "clearly and explicitly indicate[] that decision maker(s) in the poker room used race as a factor in employment decisions, which is by definition direct evidence

---

[141] *Id*. at p. 50, lines 6-7.
[142] Rec. Doc. No. 22, p. 15.
[143] 427 F.3d 987 (5th Cir. 2005).
[144] *Id*. at 991.
68650                                                                                    24

of discrimination."[145] The evidence in *Jones* is clearly distinguishable from Dr. Daniel's evidence. The statements in *Jones* were explicitly and on their face related to hiring and race. Dr. Daniel has not pointed to a single statement that was related to LSU's employment decisions.

Moreover, the evidence in *Jones* was more obviously applicable to the plaintiff than much of the evidence cited by Dr. Daniel herein. In *Jones*, the remark that black poker dealers were disfavored because white people didn't want them touching their cards clearly applied to the plaintiff, a black poker dealer, and directly stated that the basis for his non-hiring was his race. By contrast, Dr. Taboada's alleged comments about the academic achievement of black students are not directly applicable to Dr. Daniel, who Dr. Taboada knew was highly educated, nor were Taboada's remarks made in the context of a discussion of employment decisions; they were made during conversations about increasing diversity at LSU SVM. Dr. Daniel testified that LSU discriminated against her because "[Dr. Taboada] made comments about black people and I'm a black person."[146] Direct evidence this is not. To be clear, if made, the Court does not conclude that Dr. Taboada's alleged remarks were wise, appropriate, or true; nor does it suggest that Dr. Daniel was wrong to be upset by them. The Court merely concludes that the evidence cited by Dr. Daniel is not, according to the well-worn legal test that applies, *direct evidence*.

---

[145] *Id*. at 993.
[146] Rec. Doc. No. 22-5, p, 84, lines 11-12.
68650                                                                                          25

### b. *The McDonnell Framework*

Where there is no direct evidence of discrimination, as in this case, courts apply the burden-shifting test established by *McDonnell Douglas Corp. v. Green*[147] to determine whether an employer is liable for employment discrimination under Title VII. First, the plaintiff must establish a *prima facie* case of discrimination.[148] If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[149] Finally, if the employer offers such a justification, the burden shifts back to the plaintiff, who can then attempt to demonstrate that the defendant's proffered reason is merely a pretext for discrimination.[150] Ultimately, the burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.[151]

### C. *Prima Facie* Case

A plaintiff can establish a *prima facie* case of employment discrimination by proving the following: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was the subject of an adverse employment action; and (4) she was treated less favorably because of her membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.[152]

---

[147] 411 U.S. 792, 802–04 (1973).
[148] *Id*. at 802.
[149] *Id*.
[150] *Id*. at 804.
[151] *Black v. Pan Am. Labs., L.L.C.,* 646 F.3d 254, 259 (5th Cir. 2011)("The employer's burden is one of production, not persuasion, and does not involve a credibility assessment").
[152] *Paske v. Fitzgerald*, 785 F.3d 977, 984–85 (5th Cir. 2015)(citing *McDonnell Douglas*, 411 U.S. at 802).
68650                                                                                        26

LSU disputes Dr. Daniel's ability to establish the third element, contending that her *prima facie* case fails because she suffered no adverse employment action. Dr. Daniel asserts that LSU "stripped [her] job duties and relegated her to performing more clerical duties, inputting data, and providing advice,"[153] that it "excluded her from training and conferences on clinical skills," and "prohibited her from attending clinical skills committee meetings."[154] Further, Dr. Daniel contends, her "job duties were given to another white faculty member, Dr. Heidi Banse," and LSU repeatedly declined her requests for support staff, moved her office into a "closet," and then, when she complained, "began retaliating against her and intensified the harassment."[155] LSU concedes that "some of Dr. Daniel's job duties have been changed. She is no longer primarily responsible for Curriculum but is expected to continue to advise in this area."[156]

The Court finds that many of Dr. Daniel's assertions are not supported by record evidence and, to the extent that some of them are, Dr. Daniel fails to show that the circumstances constitute adverse employment action under the doctrine. Though the following points are not dispositive, it is relevant that Dr. Daniel does not dispute that, during her employment at LSU SVM, she has maintained her faculty rank, has received pay increases, and has been reappointed.[157]

The Fifth Circuit "strictly construes adverse employment actions."[158] For Title VII discrimination claims, an adverse employment action implicates an "ultimate employment decision," such as hiring, firing, demoting, promoting, granting leave, and

---

[153] Rec. Doc. No. 22, p. 6.
[154] *Id.* at p. 7.
[155] *Id.* at p. 9.
[156] Rec. Doc. No. 15-1, p. 7.
[157] Rec. Doc. No. 22-5, p. 107, lines 15-17; *Id.* at p. 108.
[158] *Peterson v. Linear Controls, Inc.,* 757 F. App'x 370, 373 (5th Cir. 2019).
68650

compensating.[159] Thus, "where pay, benefits, and level of responsibility remain the same," employment actions are typically not considered adverse.[160] The mere loss of some job responsibilities does not constitute an adverse employment action.[161] Nevertheless, "[i]n certain instances, a change in or loss of job responsibilities . . . may be so significant and material that it rises to the level of an adverse employment action."[162]

In short, the record reflects that Dr. Daniel's supervisors did not "strip" her of her Teaching Academy duties – they invited and encouraged her to collaborate with Dr. Banse on the project, which Dr. Daniel had admittedly taken no steps to initiate. The Court finds that being asked to collaborate on a project which had initially been assigned only to one employee is not such a "significant and material" change in job duties as to constitute adverse employment action. Dr. Daniel offers no analogous jurisprudence to support her claim that it does.

Dr. Banse's position on the curriculum review committee is another issue cited by Dr. Daniel as evidence of adverse employment action. She asserts that Dr. Taboada "did not see . . . a black woman having the ability to inform decisions about the curriculum"[163] and so he "hired the white woman and gave her my job responsibilities."[164] It is undisputed that Dr. Daniel was hired, in part, to work on "Instructional Design," which entailed working with the Faculty Courses and Curriculum Committee to advise on best practices for curriculum implementation. Dr. Daniel complains that she originally had two titles,

---

[159] *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007).
[160] *Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.,* 55 F. Supp. 3d 864, 877 (M.D. La. 2014), *aff'd sub nom. Minnis v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.,* 620 F. App'x 215 (5th Cir. 2015).
[161] *Thompson v. City of Waco, Texas*, 764 F.3d 500, 504 (5th Cir. 2014).
[162] *Id.*
[163] Rec. Doc. No. 22-5, p. 72, lines 21-24.
[164] *Id*. at p. 72-73.
68650                                                                                                      28

"Director of Instructional Design and Outcomes Assessment" and that "they took" one of them and made Dr. Banse the "Director of Instructional Design."[165] As discussed above, Dr. Taboada denies that he had any involvement with hiring Dr. Banse and testified that, although Dr. Banse is "performing duties that I would have hoped that Dr. Daniel would have been able to grow her position into," she is not "performing any duties that – that Dr. Daniel was actually performing."[166]

Dean Baines testified that, in his view, Dr. Banse did not take over Dr. Daniel's duties.[167] Instead, he believed that their positions coexisted insofar as Dr. Banse, a veterinarian, served as a "content expert" for curriculum design, while Dr. Daniel was a "pedagogical expert."[168] Dean Baines asserted that he has not taken away Dr. Daniel's job, only "asked her to act as part of the team."[169]

Nor does the record support Dr. Daniel's contention that she was "reassigned to clerical duties." Clearly, there is a gulf between incidentally copy-and-pasting information in the course of one's duties and being completely "reassigned to clerical duties." Word processing is a ubiquitous function practiced in jobs and occupations at every level. Further, although Dr. Taboada admits that he apologized to Dr. Daniel for raising his voice in the meeting where he asked her to take on the copy-and-paste project,[170] the Fifth Circuit has clearly held that "unpleasant work meetings, verbal reprimands, improper work requests, and unfair treatment do not constitute actionable adverse employment actions

---

[165] *Id.* at p. 74, lines 14-15.
[166] Rec. Doc. No. 20-3, p. 38.
[167] Rec. Doc. No. 20-2, p. 34, lines 13-18.
[168] *Id.*
[169] *Id.* at p. 40, lines 12-13.
[170] Rec. Doc. No. 20-3, p. 15; Rec. Doc. No. 20-3, p. 42, lines 23-24.

as discrimination or retaliation."[171] Likewise, Dr. Daniel's assertion that LSU took an adverse action against her by moving her to a smaller office fails as a matter of law. The record reflects that Dr. Daniel requested a move[172] and a move was arranged to a building where other faculty worked. Although Dr. Daniel repeatedly refers to her new office as a "closet" in her briefs, there is no evidence before the Court that the office provided to Dr. Daniel was actually a closet. A small office is not evidence of discrimination.

There are numerous disputed factual issues surrounding Dr. Daniel's assertion that she was stripped of job duties and reassigned. But even accepting her version of events wholesale, the jurisprudence is clear: unless the changes to her duties were substantial and material, there is no adverse employment action. LSU's decision to hire Dr. Banse, and the fact that Dr. Banse eventually took on some of the responsibilities that were also within Dr. Daniel's purview, does not rise to the level of an adverse action. Dr. Daniel's allegation that she was excluded from learning opportunities related to clinical skills is apparently limited to one occasion where she requested to attend a conference in Florida and her request was denied.[173] This single incident is not sufficient to establish adverse employment action.

The *Thompson* case upon which Dr. Daniel relies is distinguishable. In *Thompson*, the plaintiff was a black detective in the Waco, Texas Police Department. The plaintiff and two white detectives were accused of falsifying time sheets, after which "the Department imposed written restrictions on Thompson that it did not impose on the two white

---

[171] *King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008).
[172] Rec. Doc. No. 22-5, p. 86-87.
[173] Rec. Doc. No. 20-1, p. 133.
68650

detectives."[174] Under those restrictions, the plaintiff was forbidden to "(1) search for evidence without supervision; (2) log evidence; (3) work in an undercover capacity; (4) be an affiant in a criminal case; (5) be the evidence officer at a crime scene; and (6) be a lead investigator on an investigation."[175] The district court held that the plaintiff failed to allege an adverse employment action because he alleged only the loss of some job responsibilities, not a change to title, pay, or benefits. The Fifth Circuit reversed, holding that the plaintiff's job duties had changed so significantly that

> he no longer occupies the position of a detective; he now functions as an assistant to other detectives. Although a detective in name, Thompson alleges that he can no longer "detect"—that is, search for evidence—without supervision. Nor can he log evidence, be the affiant in a criminal case, work undercover, be the evidence officer at a crime scene, or be the lead investigator on an investigation. Thompson therefore alleges that he lost the essential job functions of a detective, he no longer uses his education and skills that he had acquired and regularly used as a detective, and his new position is less interesting, provides fewer opportunities for advancement, is less prestigious, and involves significantly diminished responsibilities.[176]

The Court finds these facts distinguishable in a number of respects. In *Thompson*, the plaintiff's job duties were changed to the extent that he was effectively neutered as a detective. Not the case here. Dr. Daniel has not established that her job duties changed as a result of some explicit action by LSU; instead, the record reflects that, based on difficulties in her relationship with Dr. Taboada and other staff members, Dr. Daniel "pushed herself away."[177] In the case of the Teaching Academy, which she alleges was "stripped" away from her or "hijacked," Dr. Daniel's own testimony establishes that she

---

[174] *Thompson v. City of Waco, Texas,* 764 F.3d 500, 502 (5th Cir. 2014).
[175] *Id*.
[176] *Id*. at 505.
[177] Rec. Doc. No. 20-3, p. 39, lines 17-18.

68650                                                                                          31

had taken no steps to implement it when Dr. Banse and Dr. Taboada moved forward. In short, though Dr. Daniel has evinced some evidence of adversity, she has not demonstrated that LSU took any *action* against her, at least not significant or material action.

*Thompson* is also distinguishable because the changes to the detective's duties were so fundamental as to be *existential*. Here, Dr. Daniel was hired, in part, to work on curriculum matters at LSU SVM. The record reflects that she is still working in that capacity, though collaboratively with others. Dr. Daniel complains that she merely "advises" on curriculum and does not have the same level of power and involvement that she enjoyed in her previous position at Tulane University. In the Court's view, based on the record evidence, it cannot be said, as in *Thompson*, that Dr. Daniel "no longer uses [her] education and skills" as a result of some adverse employment action taken by LSU. The fact that Dr. Daniel's employment at LSU has gone differently than she expected, or differently than it did at other universities, is not enough to show adverse employment action in support of a Title VII discrimination claim, especially when the Fifth Circuit has held that adverse employment action does not arise out of a plaintiff losing the ability to work only "on certain projects."[178] Finding that no reasonable jury could conclude that Dr. Daniel suffered an adverse employment action under the law, the Court concludes that LSU is entitled to summary judgment on Dr. Daniel's Title VII discrimination claim and her LEDL claim.

---

[178] *Higbie v. Kerry*, 605 F. App'x 304, 309 (5th Cir. 2015).

**D.  Title VI and Title VII Retaliation; Claim Under La. R.S. §23:967**

Dr. Daniel also contends that she suffered an adverse employment action in retaliation for reporting discrimination in the workplace. Courts apply the same legal standards to retaliation claims under both Title VI and Title VII.[179] To establish a *prima facie* case of retaliation under the traditional *McDonnell Douglas* framework, "the plaintiff must establish that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action."[180]

The Court concluded above that Dr. Daniel has not established that her employer took an adverse employment action against her. Thus, for reasons stated above with respect to Dr. Daniel's Title VII discrimination claim, her Title VII retaliation claim fails. LSU is entitled to summary judgment on this claim as well. The same can be said for Dr. Daniel's related claim under Louisiana Revised Statute §23:967, or the Louisiana Whistleblower Statute. That statute provides, in pertinent part:

> A.  An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
> (1)  Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
> (2)  Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
> (3)  Objects to or refuses to participate in an employment act or practice that is in violation of law.

---

[179] *Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003).
[180] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

As LSU points out, Louisiana courts have required the plaintiff to show an *actual* violation of state law in order to prove a reprisal claim.[181] "This," LSU argues, "Dr. Daniel cannot do."[182] The Court agrees. Dr. Daniel argues in her *Opposition* that she has demonstrated a genuine issue of material fact as to whether LSU violated La. R.S. §23:301.[183] This Court concluded *supra* to the contrary, finding that no reasonable jury could find based on the evidence that Dr. Daniel suffered adverse employment action. Moreover, while acknowledging that "reprisal," defined by the statute as "firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected,"[184] is not necessarily coextensive with "adverse employment action" under the doctrine, the Court finds that, based on the record, Dr. Daniel cannot demonstrate that any reprisal has taken place. Accordingly, LSU is entitled to summary judgment on Dr. Daniel's claim under Louisiana Revised Statute §23:967.

### E. Harassment

To establish a claim of hostile work environment under Title VII, a plaintiff must prove that she (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on [membership in the protected group]; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.[185]

---

[181] *Accardo v. Louisiana Health Servs. & Indem. Co.,* 2005-2377 (La. App. 1 Cir. 6/21/06), 943 So. 2d 381, 386 ("a violation of state law must be established by the plaintiff under the Whistleblower Statute in order to prevail on the merits of the case").
[182] Rec. Doc. No. 15-1, p. 23.
[183] Rec. Doc. No. 22, p. 24, n. 116.
[184] La. R.S. §23:967(C)(1).
[185] *Stingley v. Watson Quality Ford, Jackson, MS,* 836 F. App'x 286, 288 (5th Cir. 2020)(citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)).

68650

Harassment affects a term, condition, or privilege of employment when it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"[186] The complained-of conduct must be shown to be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[187] The Supreme Court instructs that permissive factors that may be considered by the court include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[188] "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[189]

Dr. Daniel's evidence of harassment centers around comments allegedly made by Dr. Taboada between 2014 and 2016. Above, the Court concluded that the claims arising out of these comments are prescribed. Even if they were not, the Court agrees with LSU that the comments "are simply insufficient to meet the test of creating a hostile work environment."[190] According to LSU, Dr. Daniel has not shown that the comments were sufficiently severe and pervasive; in fact, it contends, the evidence demonstrates that "[w]ith the exception of one comment, none were directed to or about Dr. Daniel. All the comments related to discussions of Black students and their ability to be successful at

---

[186] *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)(quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)).
[187] *Aryain v. Wal-Mart Stores Texas LP,* 534 F.3d 473, 479 (5th Cir. 2008)(citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998)).
[188] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).
[189] *Henry v. CorpCar Servs. Houston, Ltd.,* 625 F. App'x 607, 611 (5th Cir. 2015)(quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).
[190] Rec. Doc. No. 15-1, p. 19.
68650

the SVM. Some had nothing whatsoever to do with and did not mention race at all. . ."[191]
Dr. Daniel counters that she has successfully demonstrated harassment because Dr.
Taboada's comments "certainly expresses distain [sic] for Dr. Daniel's race."[192]

Dr. Taboada's comments are clearly distinguishable from the type of conduct that
the Fifth Circuit has found to constitute harassment. For example, in *Henry v. CorpCar
Services Houston, Ltd.,* the Fifth Circuit held that a reasonable jury could "easily find"
harassment where several black employees complained about having to attend
mandatory safety meetings on Juneteenth after several of them had requested the day
off. The CEO of their company hired a singing telegram – "a white woman in a black gorilla
suit" – to perform at the meetings. The woman in the gorilla suit "sang, danced, touched
employees, and sat in their laps. She did Tarzan yells and repeatedly referred in a
suggestive manner to 'big black lips,' 'big black butt,' and bananas. This went on for
approximately ten minutes."[193] Afterward, a manager who was present at the meeting told
one of the black employees, ""Did you enjoy it, your Juneteenth?"[194] Management
arranged for another encounter between the gorilla and a black employee, calling him to
work on his day off for him to find her waiting, at which point she said, "James, I'm here
for you again. This is your big black woman. You need her. Here's—come scratch on my
little hairy butt for me."[195] Dr. Daniel cites favorably to *Henry*, but in the Court's view, it is
disingenuous to suggest that Dr. Taboada's remarks were comparable in their
offensiveness and severity to the conduct described in *Henry*.

---

[191] *Id.*
[192] Rec. Doc. No. 22, p. 20.
[193] *Henry v. CorpCar Servs. Houston, Ltd.,* 625 F. App'x 607, 608 (5th Cir. 2015).
[194] *Id.* at 609.
[195] *Id.*
68650

Likewise, the Court finds *Rhines v. Salinas Constr. Techs. Ltd*, another case cited by Dr. Daniel as a comparator for severity, to be inapposite. In *Rhines*, the Fifth Circuit found sufficient evidence for a jury to conclude that racial harassment was severe and pervasive where a black employee at a construction company "was called racial epithets by his supervisors and coworkers and [a supervisor] had made a racial joke about how to build a 'ni – – er" trap.'"[196] The black employee was required to unload a truck of bricks by himself and was told by his supervisor that he did not want any black people around "while he was eating."[197] *Rhines* is easily distinguishable from the instant case insofar as only one of the allegedly harassing comments was even directed at the Plaintiff herein. Moreover, the use of despicable racial slurs is not on the same level of severity as Dr. Taboada's remarks, offensive though they may have been to Dr. Daniel.

The Court concludes that the conduct cited by Dr. Daniel in this case is more analogous to cases where the Fifth Circuit found a lack of severity and pervasiveness to be fatal to the plaintiff's claim of harassment. For example, in *Watkins v. Recreation and Park Com'n*, the plaintiff, a black male welder, alleged that "other employees used racially charged language or symbols in his presence on three occasions"[198] and that he "was denied training opportunities and subjected to less favorable work conditions than a similarly situated white employee."[199] The Court found that this was insufficient evidence of harassment in part because the plaintiff described only three incidents in the course of his eight-year career; the same could be said of Dr. Daniel's claim. "Though we strongly

---

[196] *Rhines v. Salinas Const. Techs., Ltd.,* 574 F. App'x 362, 365 (5th Cir. 2014).
[197] *Id.*
[198] *Watkins v. Recreation & Park Comm'n for City of Baton Rouge*, 594 F. App'x 838, 839 (5th Cir. 2014).
[199] *Id.*

condemn the type of behavior alleged by Watkins," the court stated, it also noted that "Title VII is not a 'general civility code' for the workplace."[200] Likewise here. Dr. Taboada's remarks were insensitive and ill-advised, but not so extreme as to amount to a change in the terms and conditions of Dr. Daniel's employment.

In *Peterson v. Linear Controls, Inc.,* the Fifth Circuit held that the plaintiff did not allege sufficiently severe or pervasive conduct where he claimed that he was subjected to "Muslim jokes and comments because of [his] religious beliefs (not eating pork)" and faced "different terms and conditions of employment," including his allegation that "he was on a team of five white employees and five black employees, and the black employees had to work outside and were not permitted water breaks, while the white employees worked inside with air conditioning and were given water breaks."[201] The allegations of harsher job conditions concerned only one ten-day period, the court explained, and the conditions were not egregious considering that the plaintiff's job description required him to work outside, and he was not asked to perform tasks outside of that job description. Without diminishing the impact of Dr. Taboada's comments on Dr. Daniel, the Court concludes that, applying relevant precedent, a reasonable jury could not conclude that the remark that Dr. Daniel "did not sound black on the phone" and various comments about black students in the context of discussing diversity at LSU SVM, rise to the level of severe and pervasive harassment. Accordingly, LSU is entitled to summary judgment on Dr. Daniel's harassment claim.

---

[200] *Id*. at 841.
[201] *Peterson v. Linear Controls, Inc.,* 757 F. App'x 370, 372 (5th Cir. 2019).
68650

**IV.    CONCLUSION**

For the foregoing reasons, the *Motion for Summary Judgment*[202] by LSU is GRANTED.  Plaintiff's claims are dismissed with prejudice.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED**.

Baton Rouge, Louisiana the 25th day of August, 2021.

*Shelly D. Dick*
_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[202] Rec. Doc. No. 15.

68650